UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-60875-CIV-COHN/SELTZER

IN RE MAKO SURGICAL CORPORATION
SECURITIES LITIGATION
_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

**THIS CAUSE** is before the Court on Defendants' Motion to Dismiss the

Consolidated Amended Class Action Complaint [DE 36] ("Motion").  The Court has

reviewed the Motion, Plaintiffs' Response [DE 43] ("Response"), Defendants' Reply [DE

46], the record in the case, and is otherwise advised in the premises.

I. BACKGROUND

This federal securities class action was commenced on May 10, 2012, by James

H. Harrison against Defendants MAKO Surgical Corporation ("MAKO"), Maurice R.

Ferré, M.D. ("Ferré"), MAKO's president, chief executive officer, and chairman of the

board of directors, and Fritz L. LaPorte ("LaPorte"), MAKO's senior vice president of

finance and administration, chief financial officer, and treasurer (collectively

"Defendants").  See Complaint [DE 1].  On May 18, 2012, Brian Parker filed a second

federal securities class action complaint against the same Defendants.  See Complaint

[DE 1] in Case No. 12-60954-COHN/SELTZER.  On August 2, 2012, the Court entered

an order consolidating these actions, appointing Oklahoma Firefighters Pension and

Retirement System and Baltimore County Employees' Retirement System (collectively

"Plaintiffs") as lead plaintiffs of a class of all persons who purchased or otherwise

acquired the publicly-traded common stock of MAKO Surgical Corporation between

January 9, 2012 and May 7, 2012, and approving their selection of Labaton Sucharow

LLP as lead counsel for the class and Robbins Geller Rudman & Dowd LLP as liaison counsel for the class.  See DE 24.  Plaintiffs filed a consolidated amended class action complaint on September 12, 2012.  See DE 33.  Defendants have now filed the instant Motion which seeks to dismiss the Amended Complaint.

MAKO, a surgical device company founded in November 2004, markets and develops surgical robot technology.  Am. Compl. ¶ 1.  MAKO's RIO Robotic Arm Interactive Orthopedic System ("Rio System") performs robotically-assisted orthopedic procedures, known as MAKOplasty to treat early to mid-range osteoarthritic knee and hip disease.  Id.  On January 9, 2012, MAKO announced its annual guidance of 56 to 62 RIO systems and 10,000 to 13,000 MAKOplasty procedures.  Id. ¶ 5.  Plaintiffs contend that the high 2012 guidance drove up the price of MAKO common stock almost 8% to $31.07 per share.  Id.  Ferré and LaPorte reaffirmed this guidance on multiple occasions in early and mid-March.  Id.  Accordingly, MAKO's stock price continued to rise, reaching a high of $44.98 on March 26, 2012.  Id.

Plaintiffs contend that the "2012 annual guidance announced in January 2012 and reiterated in March 2012 was materially false and misleading when made because Defendants were aware of many undisclosed, adverse facts, all of which, individually and when taken together, seriously undermined the validity of the issued guidance and showed that Defendants lacked a reasonable basis for announcing it."  Id. ¶ 6. According to Plaintiffs, the 2012 annual guidance should not have been premised upon MAKO's strong 2011 results because the 2011 RIO systems sales "were artificially inflated."  Id.  Specifically, Plaintiffs contend that the 2012 annual guidance should not have been based on the 2011 results because (1) MAKO had deferred recognition of 4-

2

6 RIO systems sold in 2010 until 2011, id. ¶ 7; (2) 11 of the 2011 RIO systems sales resulted from a bulk-order contract that was unlikely to contribute to any material increase in 2012 procedures, id. ¶ 8; and (3) a number of 2011 RIO systems sales resulted from the September 2011 launch of the total hip application, sales which were unlikely to be replicated given the low surgeon interest in the new hip application.  Id. ¶¶ 9-10.  Plaintiffs also contend that without these three "anomalous factors artificially boosting 2011 results," MAKO struggled to attain its 2011 RIO sales and procedures goals.  Id. ¶ 11.  Defendants also concealed from their investors the fact that approximately 25% of RIO systems sites accounted for 95% of MAKO's utilization.  Id. ¶ 12.  Defendants were aware of declining RIO system sales and the limited prospects for future sales at the time they issued the 2012 annual guidance.  Id. ¶¶14-16.

During a May 7, 2012 earnings call, MAKO announced that it had sold only 4 RIO systems during the first quarter and downgraded its expected yearly sales by 4 units.  Id. ¶ 18.  After this earnings call, the stock price plummeted $15.12 per share to $26.27.  Id. ¶ 20.  On July 9, 2012, MAKO issued a press release which further decreased its 2012 projected sales by ten units, or 20%.  Id. ¶ 21. MAKO's stock price dropped by $10.60 per share, or approximately 43% to $14.01.  Id. ¶ 22.  Plaintiffs allege that individual defendants Ferré and LaPorte, because of their high-level positions at MAKO and involvement in its day-to-day operations, were aware of confidential information regarding MAKO's business, including material, adverse, non-public information about MAKO.  Id. ¶ 33.  Plaintiffs bring a claim for securities fraud pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78pp ("Exchange Act"), and Rule 10b-5 against all Defendants (Count 1) and a claim

3

for control person liability pursuant to Section 20(a) of the Exchange Act against Defendants Ferré and LaPorte (Count II).  Defendants have now moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ("PSLRA"). Plaintiffs oppose the Motion.

II. DISCUSSION

**A. Legal Standard.**

1. Motions to Dismiss Generally.

Under Fed. R. Civ. P. 12(b)(6), a court shall grant a motion to dismiss where, based upon a dispositive issue of law, the factual allegations of the complaint cannot support the asserted cause of action.  Glover v. Liggett Grp., Inc., 459 F.3d 1304, 1308 (11th Cir. 2006).  Indeed, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Thus, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

Nonetheless, a complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reasonable inferences from those facts in the plaintiff's favor.  Twombly, 550 U.S. at 555.  A complaint should not be dismissed simply because the court is doubtful that the plaintiff will be able to prove all of the necessary factual allegations.  Id.  Accordingly, a well pleaded complaint will survive a motion to dismiss "'even if it appears that a recovery is very remote and unlikely.'"  Id. at 556.

### 2. Securities Fraud Claims Under Section 10(b) of the Exchange Act.

Section 10(b) of the Exchange Act makes it unlawful to:

use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To state a fraud claim under Section 10(b) and Rule 10b-5, a plaintiff must allege: "(1) the existence of a material misrepresentation or omission, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiff's economic loss."  Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 594 F.3d 783, 789 (11th Cir. 2010) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).  The circumstances of the fraudulent conduct must be alleged with particularity. Id.  (citing Fed. R. Civ. P. 9(b); Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006)).  Additionally, "[c]omplaints alleging falsity shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." Id. (quoting 15 U.S.C. § 78u-4(b)(1) (internal quotation marks omitted)). The complaint must also "present facts from which a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. (quoting Tellabs, Inc. v. Makor Issues &

Rights, Ltd., 551 U.S. 308, 324 (2007) (internal quotation marks omitted)).

    3. Control Person Liability Claims Under Section 20(a) of the Exchange Act.

    Section 20(a) of the Exchange Act provides that:

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. §78t(a).  To state a claim under Section 20(a), Plaintiffs must allege that (1) MAKO committed a primary violation of the securities law; (2) Ferré and LaPorte "had the power to control the general business affairs" of MAKO; and (3) that Ferré and LaPorte "had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability."  See Phila. Fin. Mgmt. of S.F., LLC v. DJSP Enters., Inc., No. 10-61261, 2011 WL 4591541, at *10 (S.D. Fla. Sept. 30, 2011) (quoting Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1237 (11th Cir. 2008)).  If Plaintiffs cannot state a securities fraud claim under Section 10(b) and Rule 10b-5, the control person liability claim against Ferré and LaPorte would also be subject to dismissal.  See Jabil Circuit, Inc., 594 F.3d at 797.

**B. Whether Plaintiffs Have Adequately Plead a Securities Fraud Claim Under Section 10(b) and Rule 10b-5.**

    Defendants argue that Plaintiffs have failed to state a claim for a violation of Section 10(b).  Motion at 6.  Specifically, Defendants contend that MAKO's 2012 Annual Guidance and related statements all fall within the PSLRA's safe harbor for forward-looking statements.  Id. at 7.  Defendants argue that these statements fall

within the safe harbor because they were identified as forward-looking and were accompanied by appropriate cautionary language. Id. at 10-14. Additionally, Defendants contend that the safe harbor applies despite Plaintiffs' allegations that MAKO failed to disclose certain adverse information about its 2011 sales. Id. at 14. Alternatively, Defendants argue that their statements are protected under the second prong of the safe harbor because Plaintiffs have failed to allege facts demonstrating that Defendants knew the original or revised guidance was false. Id. at 15-18. Finally, Defendants contend that Plaintiffs' allegations amount to little more than corporate mismanagement, not securities fraud. Id. at 18-20.

In opposition, Plaintiffs first argue that Defendants' misstatements do not fall within the PSLRA's safe harbor because they were not accompanied by meaningful cautionary language or are statements of present or historical fact. Response at 7-13. Plaintiffs also argue that the Amended Complaint, as plead, raises a strong inference of scienter as to MAKO, LaPorte, and Ferré. Id. at 13-20. The Court will address each of these issues individually below.

<u>1. Whether the Alleged False and Misleading Statements Fall Within the PSLRA's Safe Harbor for Forward-Looking Statements.</u>

Defendants contend that the statements Plaintiffs allege are false and misleading are actually protected under the PSLRA's safe harbor for forward-looking statements. Motion at 7. Plaintiffs disagree, arguing that the challenged statements would not fall within the safe harbor because they were not accompanied by meaningful cautionary language or are statements of present or historical fact. Response at 7-13. Under the PSLRA, a defendant cannot be held liable for certain forward-looking

statements if the statement is "identified as a forward-looking statement, and is

accompanied by meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the forward-looking

statement."  15 U.S.C. § 78u-5(c)(1)(A)(i).  "Congress enacted the safe-harbor provision

in order to loosen the 'muzzling effect' of potential liability for forward-looking

statements, which often kept investors in the dark about what management foresaw for

the company."  Harris v. Ivax Corp., 182 F.3d 799, 806 (11th Cir.1999).  Forward-

looking statements include:

> (A) a statement containing a projection of revenues, income (including income
> loss), earnings (including earnings loss) per share, capital expenditures,
> dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations,
> including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement
> contained in a discussion and analysis of financial condition by the management
> or in the results of operations included pursuant to the rules and regulations of
> the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement
> described in subparagraph (A), (B), or (C);
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent
> that the report assesses a forward-looking statement made by the issuer; or
>
> (F) a statement containing a projection or estimate of such other items as may
> be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

If a statement falls within the forward-looking statement safe harbor, a defendant

may not be found liable for securities fraud regardless of any fraudulent intent when

making the statement.  Jabil Circuit, Inc., 594 F.3d at 795 ( "So long as the language

accompanying the projections is meaningfully cautionary, the law requires us to be unconcerned with the speaker's state of mind at the time he makes the projections.").

Defendants argue that their 2012 Annual Guidance falls within the forward-looking statements safe harbor because "the guidance concerns future economic performance." Motion at 8. Defendants further argue that statements that are not themselves forward-looking also fall within the safe harbor as "assumptions underlying those statements, or [ ] related statements of current or historical fact." Id. at 9. To make this determination, the Court will examine the statements identified as false and misleading in the Amended Complaint individually below.

### a. January 9, 2012, March 6, 2012, and May 7, 2012 Press Releases.

In the January 9, 2012 Press Release, MAKO stated that it "anticipate[d] that it will sell 56 to 62 RIO systems and that its customers will perform 11,000 to 13,000 MAKOplasty procedures in 2011." Am. Compl. ¶ 156. Plaintiffs allege that this guidance was "materially false and misleading when made because Defendants lacked a reasonable basis for making it and were aware of undisclosed, adverse facts tending to seriously undermine the validity of the issued guidance." Id. ¶ 159. On March 6, 2012, Defendants issued an additional press release which stated that:

> "We are pleased with our strong operating results for the fourth quarter and the full year 2011, particularly our 91% growth in revenue from the prior year. In addition, we believe the increased level of RIO system sales, initial interest in our hip application, increased MAKOplasty procedure volume and utilization trends point to the clinical value of our technology" said Maurice R. Ferré, M.D., President and Chief Executive Officer of MAKO. "We anticipate that our positive results in 2011 will carry forward into 2012 as we continue to drive the adoption of MAKOplasty."

Am. Compl. ¶ 163. Plaintiffs allege that these statements regarding increased RIO

systems sales and financial results were "materially false and misleading and lacked a reasonable basis when made because they failed to disclose the adverse facts, among others, which were known to Defendants at that time . . . as well as the fact that there was a materially slowed sales trend for RIO systems and procedures . . . at the beginning of 2012."  Id. ¶ 164.

In the May 7, 2012 Press Release, Defendants disclosed that RIO systems sales "were at the low end of our expectations" and advised that "MAKO now anticipates selling 52 to 58 RIO systems in 2012, which compares to prior guidance of 56 to 62 RIO systems sales.  MAKOplasty procedure guidance remains unchanged at 11,000 to 12,000 expected procedures in 2012."  Id. ¶ 183.  According to Plaintiffs, this revised guidance "was still artificially inflated with respect to both metrics, and thus materially false and misleading when made because Defendants lacked a reasonable basis for making it and were aware of undisclosed, adverse facts tending to seriously undermine the validity of the issued guidance."  Id. ¶ 184.

In the Motion, Defendants contend that the January 9, 2012, March 6, 2012, and May 7, 2012 Press Releases contained the following the statement which advised investors that the guidance contained forward-looking statements:

> This press release contains forward-looking statements regarding, among other things, statements related to expectations, goals, plans, objectives and future events.  MAKO intends such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 21E of the Securities Exchange Act of 1934 and the Private Securities Reform Act of 1995.

Motion at 10-11; see also January 9, 2012 Press Release, Exhibit D to Defendants' Motion [DE 36-4] at 3; March 6, 2012 Press Release, Exhibit E to Defendants' Motion

[DE 36-5] at 4; May 7, 2012 Press Release, Exhibit F to Defendants' Motion [DE 36-6] at 4.  Defendants also point to additional cautionary language contained within the press releases and their various SEC filings.  Motion at 11-12.[1]  These warnings included that the RIO System "has a lengthy sales cycle" and that low sales could "contribute to substantial fluctuations in our quarterly revenue and substantial variation from our projections."  Motion at 11-12 (quoting 2010 Form 10-K, Exhibit A to Defendants' Motion [DE 36-1] ("2010 10-K") at 47-48).  MAKO also warned that surgeons could be slow to adapt the RIO system technology.  Id. at 12 (quoting 2010 10-K at 43; 2011 Form 10-K, Exhibit B to Defendants' Motion [DE 36-2] ("2011 10-K") at 44-55).  According to Defendants, these warnings "provided meaningful cautionary warnings about the difficulties of projecting RIO system sales and MAKOplasty procedures," thus falling within the safe harbor.  Motion at 14.

Plaintiffs contend that Defendants have failed to demonstrate that this safe harbor applies.  Response at 6.  According to Plaintiffs, any warning regarding decreased sales was meaningless because it is "the kind of generic risk factor that could apply to any medical device company (or any company that sells products)."  Id. at 7.  Similarly, Plaintiffs argue that MAKO's warnings regarding its variable sales cycle are also generic because they are "applicable to essentially all medical device as well

_____

[1]        When deciding a motion to dismiss based on the statutory safe harbor, the Court must consider "any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  DJSP Enters., Inc., 2011 WL 4591541, at *15 n.14 (quoting 15 U.S.C. § 78u-5(e)).  The Court also may take judicial notice of SEC filings.  Id. at *3 n.5 (citing Thompson v. RelationServe Media, Inc., 610 F.3d 628, 631 n.5 (11th Cir. 2010)).

as many other businesses and was not tailored to the specific, known risks underlying the poor RIO system sales and procedures." Id. at 8.  Finally, Plaintiffs contend that MAKO's warning regarding the failure of its technology to be adopted by surgeons is "too generic to be meaningful to MAKO investors assessing risk." Id. at 9.

Here, the Court finds that meaningful, cautionary language accompanied the forward-looking statements in the Press Releases.  First, the Court finds that the statements identified by Plaintiffs in the Press Releases are clearly forward-looking because they involve revenue projections.  See Harris, 182 F.3d at 805 ("Forward - looking statement[s] include 'statements of future economic performance.'") (quoting 15 U.S.C. § 78u-5(i)(1)(C)).  Second, the Court disagrees with Plaintiffs' assessment that the cautionary language was "mere boilerplate." See Response at 13-17.  The cautionary language accompanying the Press Releases is "detailed and informative; it tells the reader in detail what kind of misfortunes could befall the company and what the effect could be." See Harris, 182 F.3d at 807.  As the Eleventh Circuit said in Harris v. Ivax Corp., "[t]he statute requires the warning only to mention important factors that could cause actual results to differ materially from those in the forward-looking statement. . . . It does not require a listing of all factors." 182 F.3d at 807 (internal citation marks and quotations omitted) (emphasis in original).  Notably, the warnings in Defendants' Press Releases and referenced SEC filings warned investors of precisely what happened here: that projected system sales and procedures might be lower than projected due to the economic downturn, variable sales, and a reluctance on the part of orthopedic surgeons to adopt the new technology. See, e.g., Motion at 11-12.  The Eleventh Circuit has said "when an investor has been warned of risks of a significance

12

similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward."  Harris, 182 F.3d at 807.

Defendants' reliance upon Police Retirement System of St. Louis v. Intuitive Surgical, Inc., No. 5:10-cv-03451-LHK, 2012 WL 1868874 (N.D. Cal. May 22, 2012), is well-placed.  Intuitive Surgical, also a manufacturer of robotic surgery devices, was sued by investors based upon allegedly false and misleading statements related to its projected sales.  Id. at *1-2.  In ruling upon a motion to dismiss, the court found that statements regarding projected revenue were forward-looking and that the company's SEC filings identified that "actual results could vary based on risks and uncertainties . . . [such as] failure to achieve 'market acceptance' by slow adoption of the da Vinci System, unforeseen national and global economic downturns, and inability of institutions and doctors to obtain sufficient reimbursement for use of the da Vinci System."  Id. at *11.  Accordingly, the court granted the motion to dismiss because these statements fell within the safe harbor.  Id.; see also In re St. Jude Med., Inc., Sec. Litig., 629 F. Supp. 2d 915, 923 (D. Minn. 2009) ("Plaintiffs respond, claiming defendants' projections fall beyond the safe harbor's ambit. . . . They further maintain any 'cautionary language' was not meaningful or specific enough to afford safe-harbor protection. Plaintiffs are wrong.  Defendants' 'cautionary language,' touching cost-conscious reductions in ICD procedures, alternative therapies, and fears or reticence about ICDs themselves, accurately predicted real-world events which decreased ICD sales.").

Plaintiffs' citation of FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282

13

(11th Cir. 2011), for the proposition that Defendants' warnings were generic is

misplaced.  In FindWhat.com, the Eleventh Circuit held that where "[t]he Form 10–K's

cautionary language consisted only of general warnings about risks inherent to the

Company's business model, and was not 'specifically tailored' to risks from *click fraud*,"

the defendant had failed to provide meaningful cautionary language.  Id. at 1299

(emphasis added).  By contrast here, Defendants' warnings were specifically tailored to

factors which could lead to decreased RIO systems sales and MAKOplasty

procedures.[2]  Moreover, the Court disagrees with Plaintiffs' contention that these

statements do not fall within the safe harbor because, at the time Defendants issued

the 2012 guidance, "it was already known internally that surgeons were not in fact

adopting the RIO system and MAKOplasty at the rates Defendants had projected and

---

[2]      Similarly, the Court is not persuaded by Plaintiffs' reliance upon Yanek v.
STAAR Surgical Co., 388 F. Supp. 2d 1110 (C.D. Cal. 2005).  In Yanek, the court found
that the cautionary language in the press releases was inadequate where "[t]he risks
associated with the 'acceptance of new products' by consumers and 'general domestic
and international economic conditions,' for instance, are factors that are so broad that
they apply to any business that sells products to consumers."  Id. at 1123.  By contrast,
here, MAKO specifically disclosed in its 2010 10-K that "[o]ur RIO system has a lengthy
sales cycle because it is a major piece of capital equipment, the purchase of which will
generally require the approval of senior management at hospitals, inclusion in the
hospital's budget process for capital expenditures and, in some instances, a certificate
of need from the state or other regulatory clearance," all of which might contribute to
difficulty in forecasting sales and "substantial fluctuations" in quarterly revenue.  2010
10-K at 47-48.  MAKO also disclosed that "We believe MAKOplasty represents a
fundamentally new way or performing arthoplasty. ... The orthopedic market has been
traditionally slow to adopt new products and treatment practices."  2011 10-K at 44.
Thus, the warnings Defendants provided were specifically tailored to a niche product:
i.e. whether the RIO systems would be purchased by hospitals and the MAKOplasty
procedures adopted by orthopedic surgeons.  The Court strongly disagrees with any
assertion by the Plaintiffs that these warnings were boilerplate or could apply to any
new product like the warnings discussed in Yanek.

that the market for the system was already saturated."  <u>See</u> Response at 10.   As

Defendants point out, allegations relating to assumptions underlying MAKO's 2012

annual guidance are protected by the safe harbor.  <u>See</u> Motion at 14.  The Eleventh

Circuit's opinion in <u>Elhert v. Singer</u>, 245 F.3d 1313 (11th Cir. 2001), is instructive on this

point.  In <u>Elhert</u>, the court stated that:

> [t]he PSLRA safe-harbor requires only that the cautionary language mention
> "important factors that could cause actual results to differ materially from those in
> the forward-looking statement." 15 U.S.C. § 77z-2(c). It does not require that the
> prospectus list all factors that might influence the company's financial future. <u>See</u>
> <u>Harris</u>, 182 F.3d at 807. As this Court held in <u>Harris</u>, "[M]ust the cautionary
> language explicitly mention the factor that ultimately belies a forward-looking
> statement? We think not.... [W]hen an investor has been warned of risks of a
> significance similar to that actually realized, she is sufficiently on notice of the
> danger of the investment to make an intelligent decision about it according to her
> own preferences for risk and reward." <u>Id.</u> In this case, the warnings actually given
> were not only of a similar significance to the risks actually realized, but were also
> closely related to the specific warning which Plaintiffs assert should have been
> given. Because we conclude that adequate cautionary language accompanies
> the forward-looking statement, we hold that Defendants are protected from
> liability under the safe-harbor.

245 F.3d at 1319-20; <u>see also</u> <u>Jabil Circuit Inc.</u>, 594 F.3d at 796 ("However we cast

forward-looking statements accompanied by meaningful cautionary language, an

allegation that the speaker knew the statements were false does not convert those

statements, mitigated by adequate warnings of risks, into actionable frauds.").  Here,

because Defendants specifically warned about the potential for variable RIO systems

sales and reluctance of orthopedic surgeons to adopt the MAKOplasty technology–the

risks actually realized–they are shielded from liability under the safe harbor, regardless

of any allegations in the Amended Complaint that Defendants knew these statements

were false when made.

**b. Oral Statements Made During Earnings Calls and Conferences.**

In the Amended Complaint, Plaintiffs also allege that certain statements made during earnings conference calls and at conferences are false and misleading.  See Am. Compl. ¶¶ 165-177, 185-209.  Defendants contend that the majority of these oral statements were disclosed as forward-looking statements.  Motion at 10.   In their Response, however, Plaintiffs allege that certain statements fall outside the safe harbor because they were statements of current or historical fact and were not specifically identified as forward-looking.  Response at 11-13.  The parties appear to dispute only whether two statements made by Dr. Ferré during the May 7, 2012 Earnings Conference Call are entitled to protection under the safe harbor as forward-looking statements.  See Motion at 9-10; Response at 12-13.[3]  Accordingly, the other oral statements identified in the Amended Complaint would fall within the safe harbor as forward-looking statements for the reasons discussed above.  Thus, the Court will examine whether the oral statements made at the May 7, 2012 Earnings Conference Call are forward-looking.

Under the PSLRA, an oral forward-looking statement falls under the safe harbor:

(A) if the oral forward-looking statement is accompanied by a cautionary statement–

_____

[3]      Defendants concede that they are unable to establish whether a statement LaPorte made at the March 14, 2012 Barclays Capital Global Healthcare Conference was identified as a forward-looking statement.  See Motion at 10 n.2.  Accordingly, the Court is unable to conclude that this statement falls under the safe harbor as a forward-looking statement.  The Court will separately examine whether this statement is nonetheless protected under the safe harbor because Plaintiffs have failed to plead facts demonstrating whether LaPorte knew the statement was false separately in section B.2 below.

16

(i) that the particular oral statement is a forward-looking statement; and

(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

(B) if–

(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5(c)(2).  The PSLRA's safe harbor for forward-looking statements does not apply to misstatements or omissions of historical or contemporaneous facts.  In re 21st Century Holding Co. Sec. Litig., 2008 WL 5749572, at *12 (S.D. Fla. Nov. 7, 2008). Here, Plaintiffs contend that two statements[4] Ferré made during the May 7, 2012 Earnings Conference Call are statements of current or historical fact which cannot fall within the safe harbor as forward looking statements.  See Response at 12-13; Am. Compl. ¶ 242(b)-(c).  Defendants, however, contend that these statements may also be considered forward-looking because they were included in an earnings conference call with other statements that were forward-looking.  Motion at 9.  Plaintiffs disagree,

---

[4]       The statements Plaintiffs identified include: (1) "[W]e always have given guidance where we feel is a number that we can make."  Am. Compl. ¶ 242(b); and (2) "And here are various typical reasons on the count by count basis on system sales that didn't occur in the quarter.  It's important to note that none of these accounts fell out of our sales funnel."  Id. ¶ 242(c).  The Court agrees with Plaintiffs' assessment that these are statements of current or historical fact.

arguing that Defendants have misconstrued <u>Harris'</u> holding and that such statements of current or historical fact are not forward-looking merely because they were given alongside other forward-looking statements.  Response at 12-13.

In <u>Harris</u>, the Eleventh Circuit held that where a press release contained a list of factors which would influence the defendant's results, some of which were forward-looking and some of which were statements of current or historic fact, the entire list was to be treated as a forward-looking statement.  182 F.3d at 806.  Defendants urge the Court to read this opinion to mean that because some statements made during the conference call were forward-looking, the entire conference call should be deemed forward-looking.  <u>See</u> Motion at 9.  The Court disagrees with Plaintiffs that Defendants have misread <u>Harris</u>.  The Eleventh Circuit explicitly stated that they were extending the safe harbor to "lists that contain both factual and forward-looking factors."  <u>Harris</u>, 182 F.3d at 806.  It is apparent that these two statements were delivered during a larger discussion of "factors underlying a projection or economic forecast," and thus qualify as forward-looking.  <u>See id.</u> at 807; <u>see also</u> Reply at 5-6.

This result is supported by the Middle District of Florida's holding in <u>Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.</u>, 560 F. Supp. 2d 1221 (M.D. Fla. 2008).  In that case, the court held that where a conference call concentrated on "success in the third and fourth quarters of fiscal year 2006 and the factors that might affect that success," statements of present and historic fact made during the conference call also qualified as forward-looking.  <u>Jabil Circuit, Inc.</u>, 560 F. Supp. 2d at 1237.  Accordingly, because Ferré's statements of present or historical fact were similarly delivered in the context of explaining MAKO's revised guidance during the May

18

7, 2012 Earnings Conference Call, the Court finds that these statements fall within the safe harbor as forward-looking statements.

<u>2. Whether the Alleged False and Misleading Statements Fall Within the PSLRA's Safe Harbor Because the Person Making Them Did Not Know They were False or Misleading.</u>[5]

Alternatively, Defendants argue their statements fall under the PSLRA's safe harbor because the Plaintiffs have failed to allege facts showing that Defendants had actual knowledge that the original or revised guidance was false or misleading.  Motion at 15.  In support of this argument, Defendants contend that the confidential witnesses Plaintiffs interviewed are not reliable and that the information provided by the confidential witnesses does not establish scienter on the part of Ferré and LaPorte.  <u>Id.</u> at 16-18.  In opposition, Plaintiffs contend that their confidential witnesses are reliable and that the facts alleged in the Amended Complaint "amply support a strong inference that Ferré and LaPorte had actual knowledge of current facts that seriously undermined the accuracy of the 2012 annual guidance."  Response at 14-19.  Additionally, Plaintiffs argue that they have adequately plead scienter because they have alleged that "Ferré and LaPorte closely monitored RIO sales and procedure volumes and associated guidance" and that Ferré and LaPorte "were hands-on executives."  <u>Id.</u> at 19.

Even if a forward-looking statement does not contain the necessary disclosures,

---

[5]     The Court has considered this alternative argument in favor of dismissal in light of Defendants' concession that they cannot establish whether LaPorte's statement made at the March 14, 2012 Barclays Capital Global Healthcare Conference was identified as a forward-looking statement.  Although the Court has confined its analysis to the March 14, 2012 Barclays Capital Global Healthcare Conference statement, this analysis would be equally applicable to the other forward-looking statements alleged in the Amended Complaint.

it is also protected under the safe harbor if the plaintiff fails to establish that the

defendant made the statement with "actual knowledge" that it was "false or misleading."

15 U.S.C. § 78u-5(c)(1)(B).  Here, the only statement which the Court was unable to

conclude fell under the cautionary language provision of the safe harbor is LaPorte's

statement at the March 14, 2012 Barclay Capital Global Healthcare Conference where

LaPorte stated that:

> But we are seeing them continue to invest in capital that has a good economic
> story and return on investment. I think that is where [we are] with our partial knee
> business– and hopefully we can demonstrate that as well in hip– that we provide
> that value and have continued to see in all those macroeconomic environment
> considerations, to the extent we can predict them or understand where they
> might be going, are all factored into our guidance.

See Am. Compl. ¶ 173.  Before the Court can determine whether this statement falls

under another provision of the safe harbor, the Court must first determine whether it is

forward-looking.  Plaintiffs allege in the Amended Complaint and in their Response that

this statement is a statement of current or historical fact and thus does not qualify for

any provision of the safe harbor.  See Response at 12 n.9; Am. Compl. ¶ 242(a).  The

Court disagrees and finds that this statement may be considered forward-looking.  The

Amended Complaint itself supports this result.  The conference was held on March 14,

2012, almost a week after MAKO filed its 2011 Form 10-K.  Am. Compl. ¶ 172.  The

very statement which Plaintiffs allege is a statement of current or historic fact was

delivered in response to an analyst's question regarding MAKO's confidence in its

"placement guidance" in the current capital spending environment.  Id. ¶ 173.  This

statement is forward-looking because it discusses assumptions underlying MAKO's

future projected revenue.  15 U.S.C. § 78u-5(i)(1)(A), (D).[6]

Defendants first argue that the confidential witnesses Plaintiffs rely upon for their allegations regarding Ferré and LaPorte's actual knowledge that the statements in Amended Complaint were false or misleading are unreliable.  Motion at 16. Specifically, Defendants point to the fact that three of the six confidential witnesses left MAKO before the class period even started, id., and that all of the former MAKO employee-witnesses held lower-level positions and did not have access to upper-level management meetings and discussions.  Id. at 17.  Plaintiffs argue that it is irrelevant that three of the confidential witnesses left MAKO before the commencement of the class period because "Plaintiffs allege that Defendants had information as early as the first quarter of 2011 that seriously undermined the validity of that guidance."  Response at 14-15.  Additionally, Plaintiffs contend that Defendants' assertion that the confidential witnesses were all "lower-level employees" is also inaccurate because CW1 was a regional sales manager, CW3 once attended offsite Quarterly Business Review ("QBR") meetings led by Ferré and LaPorte, and CW4 "had direct contact with LaPorte concerning the sharp drop in procedure volume in early 2012."  Id. at 16.

"[A]nonymous sources may be used to sustain complaints under the PSLRA so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information

---

[6]        In their Reply, Defendants also assert that this statement was clearly forward-looking because its truth or falsity was only discernable after it was made. Reply at 6.  Defendants point to the fact that MAKO made its sales goal for the third quarter of 2012 as evidence that the statement was true and that hospitals were continuing to invest in MAKO's technology.  Id. at 7.

alleged."  Marrari v. Med. Staffing Network Holdings, Inc., 395 F. Supp. 2d 1169, 1188

(S.D. Fla. 2005).  When assessing the statements of confidential witnesses, courts may

consider factors such as  "the position(s) held, the proximity to the offending conduct,

and the relevant time frame."  Mizzaro, 544 F.3d at 1240.  In this case, the Court need

not resolve whether the confidential witness statements are reliable or not because the

"amended complaint, taken as a whole, [fails to] create[ ] a strong inference—one that

is cogent and compelling—that the individual defendants acted with the required

scienter."  Id. at 1247.

        No allegations in the Amended Complaint establish that Ferré and LaPorte had

actual knowledge that the 2012 Guidance was false and misleading when made.  For

example, the mere fact that CW1 reported to Steven J. Nunes, the Senior Vice

President of Sales and Marketing, who in turn reported to Ferré, does not establish that

Ferré was aware that the MAKOplasty procedures goals for Health Management

Associates ("HMA") hospitals "were unrealistic and unattainable."  Am. Compl. ¶¶ 53,

58.  Moreover, the mere conclusory allegation that this problem "was widely known

within MAKO at that time in 2011" fails to establish actual knowledge on the part of

Ferré and LaPorte.  See id. ¶ 58.  Additionally, the fact that CW1's statements are

corroborated by CW2, a regional sales manager, fails to establish actual knowledge on

the part of Ferré and LaPorte.  See id. ¶ 59.

        CW3's statement that Ferré and LaPorte had access to Sales Logic, an internal

client relationship management program, does not establish their actual knowledge that

the 2012 Guidance was too high.  See id. ¶ 64.  The Court also is not persuaded by

Plaintiffs' argument that CW3's attendance at QBR meetings, which Ferré and LaPorte

also attended, establishes that "Ferré and LaPorte were confronted with many facts directly undermining MAKO's 2012 guidance." See Response at 16-17.  CW3's insistence that Ferré and LaPorte "must have known about and approved the deferred recognition" of 4-6 RIO sales from 2010 to 2011 fails to establish actual knowledge on the part of Ferré and LaPorte.  See Am. Compl. ¶ 74.  Taken collectively, the allegations of the Amended Complaint fail to establish a strong inference of scienter on the part of LaPorte and Ferré.[7]

The Court is also not persuaded by Plaintiffs' argument that they have established scienter through their allegations that MAKOplasty was MAKO's "entire business" and Defendants "were hands-on executives who closely monitored the number of RIO systems sold and MAKOplasty procedures performed." See Response at 19.  Ferré and LaPorte's knowledge cannot be inferred based upon their positions in the company.  See Schultz v. Applica Inc., 488 F. Supp. 2d 1219, 1227 (S.D. Fla. 2007) ("Plaintiffs have not alleged with particularity that Defendant Michienzi and Defendant Polistina were directly informed of product defects such that they knew or should have known that their statements were deceptive or likely to mislead investors at the time they were made.  Plaintiffs' conclusory allegations that these Defendants knew or recklessly disregarded the falsity of their statements or omissions based on their positions in the corporation is insufficient to meet the heightened pleading requirement

---

[7]     Moreover, taken collectively, Plaintiffs' allegations regarding MAKO's faltering sales do not establish that the 2012 Guidance was false or misleading when made.  As Defendants point out, the 2012 Guidance projected a sales increase of 16-29% whereas MAKO's sales actually increased by 73% in 2010 and 45% in 2011. Reply at 8.

for scienter.") (footnote omitted).  Thus, LaPorte's statement at the March 14, 2012

Barclays Capital Global Healthcare Conference falls under the PSLRA's safe harbor

because the Plaintiffs have failed to allege facts showing that Ferré and LaPorte had

actual knowledge that the original or revised guidance was false or misleading.[8]

### C. Whether Plaintiffs Have Adequately Plead a Control Person Liability Claim Under Section 20(a) of the Exchange Act.

Defendants also seek dismissal of Plaintiffs' claim for control person liability

under Section 20(a) of the Exchange Act.  Motion at 20.  According to Defendants,

where there is no primary violation of the Exchange Act, there cannot be a control

person liability claim.  Id. (citing Rosenberg v. Gould, 554 F.3d 962, 966-67 (11th Cir.

2009)).  Because the Court finds that Plaintiffs have failed to state a claim for securities

fraud under Section 10(b) and Rule 10b-5, dismissal of the claim for control person

liability is also proper.  See Jabil Circuit, Inc., 594 F.3d at 797.

### D. Plaintiffs' Request for Leave to Amend.

In the conclusion of their Response, Plaintiffs request that, if the Court grants the

Motion, they be granted leave to file a Second Amended Complaint.  See Response at

20.  As the Court held in DJSP Enterprises, Inc., "[t]his bare request is not sufficient to

raise the issue of whether Plaintiffs should be granted leave to amend their complaint

further."  2011 WL 4591541, at *17 (citing Rosenberg, 554 F.3d at 967).[9]  Instead,

---

[8]     Because the Court has found that all statements alleged in the Amended
Complaint are protected by the PSLRA's safe harbor, the Court need not consider
Defendants' argument that many of Plaintiffs' allegations amount to little more than
claims of corporate mismanagement.  See Motion at 18-20.

[9]     Plaintiffs cite Roseberg v. Gould for the proposition that the court has
discretion to grant a request for leave to amend made in a brief opposing a motion to

when requesting leave to amend, a plaintiff must either attach a proposed amended complaint or describe the substance of the proposed amendments.  Id.  Because Plaintiffs have failed to identify to the Court the substance of the proposed amendment, the Court cannot determine whether the proposed amendments would be futile. Accordingly, rather than grant Plaintiffs' request, the Court will establish a deadline for Plaintiffs to file a motion seeking leave to file a Second Amended Complaint which attaches the proposed Second Amended Complaint as an exhibit.

III. CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1.    Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [DE 36] is **GRANTED**; and

2.    Plaintiffs shall file any motion for leave to file a Second Amended Complaint which attaches the proposed Second Amended Complaint on or before **June 5, 2013.**

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, on this 15th day of May, 2013.

JAMES I. COHN
United States District Judge

Copies provided to counsel of record via CM/ECF.

---

dismiss.  See Response at 20 n.20.  In fact, the Eleventh Circuit actually said that "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly" and that the Court has discretion to deny that request.  554 F.3d at 967 (citing Posner v. Essex Ins. Co., 178 F.3d 1209, 1222 (11th Cir.1999)).